**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:13-cr-00038-JCM-PAL |
| | ) | |
| Plaintiff, | ) | **REPORT OF FINDINGS AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | (Mtn to Suppress - Dkt. #18) |
| ANDREI RAILEANU, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The court held an evidentiary hearing on Defendant Andrei Raileanu's Motion to Suppress for Fourth Amendment Violations (Dkt. #18) on July 18, 2013. The hearing was continued and the second day of the evidentiary hearing was held August 1, 2013. The court has considered the Motion, Defendant's Supplement (Dkt. #30), the government's Opposition (Dkt. #33), the evidence adduced at the evidentiary hearings, and the arguments of counsel. Following the hearing, counsel for the government requested an opportunity to submit supplemental points and authorities on a *Miranda* issue which surfaced during the testimony. The court granted the request, and gave both sides an opportunity to file supplemental points and authorities. The court has now reviewed the Supplement to the Government's Opposition (Dkt. #41) and Defendant's Reply (Dkt. #43).

**BACKGROUND**

Raileanu was initially charged in a criminal Complaint (Dkt. #1) filed January 15, 2013, with Possession of Fifteen or More Counterfeit and Unauthorized Access Devices in violation of 18 U.S.C. § 1029(a)(3), and Aiding and Abetting in violation of 18 U.S.C. § 2. Raileanu made an initial appearance on the Complaint on January 15, 2013, was appointed counsel, was and detained pending trial after a detention hearing. *See* Minutes of Proceedings (Dkt. #4); Order of Detention (Dkt. #7). On January 29, 2013, the grand jury returned an Indictment (Dkt. #9) charging Raileanu with Trafficking In, Production of, and Use of Counterfeit Access Devices in violation of 18 U.S.C. § 1029(a)(1), and

1   Possession of Fifteen or More Counterfeit or Unauthorized Access Devices and Aiding and Abetting in

2   violation of 18 U.S.C. § 1029(a)(3) and 18 U.S.C. § 2.  Raileanu was arraigned and pled not guilty on

3   February 8, 2013.  *See* Minutes of Proceedings (Dkt. #13).

4           The initial Motion to Suppress was filed by Raileanu's first appointed counsel.  On March 21,

5   2013, Raileanu's prior counsel filed a Motion to Withdraw (Dkt. #22).  The court held a hearing on the

6   Motion to Withdraw on March 28, 2013.  *See* Minutes of Proceedings (Dkt. #24).  The court allowed

7   Mr. Grasso to withdraw as counsel of record and stayed the deadline to file a reply regarding the

8   Motion to Suppress pending appointment of new counsel.  *Id.*  On April 4, 2013, the court appointed

9   attorney T. Louis Palazzo to represent Raileanu and gave Mr. Palazzo additional time to review the

10  original Motion to Suppress and file any supplemental papers.  *See* Minutes of Proceedings (Dkt. #26)**.**

11                                           **DISCUSSION**

12  **I.      The Parties' Positions.**

13          Raileanu seeks an order suppressing any statement he made to officers, any evidence discovered

14  by law enforcement after he was detained, and evidence of Raileanu's identity.  First, he argues that

15  Officer Bundy lacked probable cause or reasonable suspicion to stop the car Raileanu was driving

16  because the stop was predicated on a mistake of law.  Specifically, relying on *United States v. Colin,*

17  314 F.3d 439 (9th Cir. 2002) (applying California law), Raileanu contends that Officer Bundy stopped

18  him because Officer Bundy mistakenly believed crossing the fog line was a traffic infraction or

19  evidence of unsafe operation in violation of NRS 484B.223.  Although the Nevada Supreme Court has

20  not interpreted NRS 484B.223, other courts interpreting similar statutes have held that minor, isolated

21  crossing of a lane line does not violate a statute requiring a driver to safely maintain his or her travel

22  lane.  Officer Bundy's police report indicates he pulled the vehicle over for a violation of NRS

23  484B.223 for crossing over the fog line three times in one-quarter of a mile.  This was a mistake of law

24  and as such, Bundy lacked reasonable suspicion to stop Raileanu.  Even if he made a good-faith mistake

25  of law, reasonable suspicion was lacking and the stop was not justified.

26          Second, Raileanu requested an evidentiary hearing to determine the voluntariness of his

27  statements and whether *Miranda* warnings were administered.  The motion claims that Raileanu has

28  difficulty speaking, reading and understanding the English language.  The motion claims that the law

2

enforcement conduct in this case overbore his free will and rational intellect.  Specifically, the show of force combined with other, as yet unascertained events and circumstances during the interrogation, rendered Mr. Raileanu's purported waiver of rights invalid.

Third, the statements made to Special Adams must be suppressed under 18 U.S.C. § 3501(c) because they were seemingly obtained more than six hours after Mr. Raileanu's arrest in violation of Fed. R. Crim. P. 5(a), which requires an arrested person to be arraigned without unreasonable delay.

Fourth, Raileanu asserts his Fourth Amendment rights were violated because Officer Bundy unreasonably prolonged the traffic stop for a simple fog line encroachment infraction.  The stop was improper in the first instance, and Officer Bundy should have issued a citation or warning and allowed Mr. Raileanu to leave.  However, he began investigating for other unspecified reasons predicated on a hunch or suspicion, which the Fourth Amendment prohibits.

The government opposes Raileanu's motion, arguing that Officer Bundy had reasonable suspicion to stop Raileanu's vehicle based on a combination of factors.  Specifically, based on the reports of Officer Bundy and Special Agent Adams, Bundy observed the driver of a black Mercedes acting suspiciously prior to the stop in addition to driving over the fog line.  Officer Bundy first observed the black Mercedes traveling in an opposite direction on Mesquite Boulevard and made a u-turn to travel in the same direction.  When he did so, the Mercedes pulled quickly into the parking lot of a Terrible's gas station where the driver, subsequently identified as the Defendant, got out and walked into a convenience store.  The officer regarded this as odd behavior and continued to investigate the Mercedes.  He drove around the block, and approximately one minute later, saw Raileanu walking around the parking lot "plainly on the lookout for something or someone."  As Bundy drove by, Raileanu spotted Bundy's patrol car and walked around the gas station.  The combination of these circumstances established reasonable suspicion.

After the vehicle was pulled over, Officer Bundy asked Raileanu for his driver's license. Raileanu did not have one.  Raileanu denied that he had been drinking and claimed that he and his passenger were on their way to a skiing trip in Utah.  Raileanu told Bundy he behaved suspiciously at Terrible's because did not have a driver's license and did not want to get pulled over.  Bundy asked Raileanu to consent to a search, which he did.  The search recovered thirty pre-paid "Vanilla Visa"

cards, *i.e.,* cards with no names on them.  On the front of each card was a piece of tape with several four-digit numbers crossed out and new four-digit numbers written in.  Additional cards were found in a leather purse in the vehicle.  Defendant and his passenger, Ms. Mila Dopca, were given *Miranda* warnings.  Officer Bundy learned from his police dispatcher that Raileanu was a native of Moldova and the subject of an Immigration and Customs Enforcement ("ICE") detainer.

The government's response argued that Raileanu and Ms. Dopca agreed to accompany Bundy to the nearby Mesquite justice facility in their own vehicle.  When they reached the justice facility around midnight, they received food and water while waiting for Special Agent Adams.  Both Mr. Raileanu and Ms. Dopca were re-advised of *Miranda* warnings by Special Agent Adams and agreed to talk.  The government argues that under the totality of circumstances, Raileanu's oral consent to search his vehicle was voluntary.  Similarly, the government maintains that Raileanu received and made a knowing and voluntary waiver of *Miranda* rights first to Officer Bundy, and then to Special Agent Adams.  The government acknowledges that it has the burden of proving by a preponderance of evidence that Raileanu made a voluntary, knowing and intelligent waiver of his *Miranda* rights.  The government expected both Officer Bundy and Special Agent Adams to testify that Raileanu acknowledged he understood his *Miranda* rights and voluntarily and knowingly waived them.  The government also expected testimony to support a finding that there was no intimidation, coercion or deception to render the statements involuntary.

**II.     Testimony at the Evidentiary Hearing.**

The government called three witnesses at the evidentiary hearing, Mesquite Police Officers Jordan Bundy and Quinn Averett, and Special Agent Michael Adams.  The defense called Mila Dopca. The court canvassed Mr. Raileanu concerning his right to testify or not.  Mr. Raileanu acknowledged that he had discussed the matter with counsel and understood that he had the right to testify if he wished but could not be compelled or made to do so.  Mr. Raileanu also advised the court that after conferring with counsel, it was his decision not to testify at the evidentiary hearing in this matter.

**A.     Testimony of Officer Jordan Bundy**.

Officer Bundy is employed by the Mesquite Police Department and has been so employed for approximately two years.  On January 13, 2013, he was on duty in uniform and in a marked patrol

4

vehicle.  While on routine patrol, he observed a black 2002 Mercedes driving eastbound on Mesquite

Boulevard as he was driving westbound on Mesquite Boulevard from the intersection of Riverside

Road.  He made a u-turn to go eastbound on Mesquite Boulevard at a break in the center median.  As he

made the turn, he observed the black Mercedes make a right-hand turn into a Terrible's gas station

parking lot at the corner of Riverside Road and Mesquite Boulevard.  This caught his attention because,

based on his training and experience in making numerous traffic stops and arrests, when he makes a

turn and a vehicle immediately tries to avoid him, it alerts him that "there was possible criminal activity

afoot."  Officer Bundy believed that the driver of the black Mercedes saw him make a u-turn "which

possibly caused him to turn into the gas station."

The Mercedes parked on the west side of the gas station.  Officer Bundy observed the driver of

the vehicle get out, and Bundy got a quick description of what the driver was wearing and looked like.

He "thought it was suspicious, just the circumstances surrounding the activity of the vehicle."  Bundy

continued east on Mesquite Boulevard and looped around the block.  As he passed the Terrible's gas

station, he looked to the left and saw the same individual who had gotten out of the black Mercedes

standing on the northeast corner of the building.  It appeared to Bundy that the individual was looking

out for his police car, which further raised his suspicion that there was something going on.  The

individual, later identified as Raileanu, appeared to be peering around the corner of the building on the

opposite side of the building from where his car was parked.

After observing Raileanu on the corner, Bundy continued north on Riverside Road, turned onto

Mesquite Boulevard, and pulled his patrol vehicle into a trailer park where he was able to see when the

Mercedes left the gas station parking lot.  After a couple of minutes, the black Mercedes left the parking

lot and headed eastbound on Mesquite Boulevard, making a u-turn to go west on Mesquite Boulevard.

Bundy allowed the vehicle to get ahead of him a bit and saw the vehicle continue west on Mesquite

Boulevard toward the on-ramp to I-15.  The vehicle entered the northbound on-ramp at Exit 120, and

Bundy followed.  Bundy was suspicious of the occupants of the vehicle because of what he regarded as

Raileanu's suspicious behavior in pulling into a gas station, peeking around the corner to look out for

his police car, and possibly trying to avoid Bundy for some unknown reason.  For these reasons, he

believed there was "criminal activity afoot."  He wanted to stop the vehicle to contact the driver and

find out what he was doing at the gas station, whether he was a DUI driver, intoxicated, or had illegal narcotics or contraband inside the vehicle to verify.  Bundy followed Raileanu's vehicle approximately a quarter mile after entering the freeway northbound when he observed the passenger side tires cross onto the white fog line three times within a quarter of a mile.  This caused him to believe that possibly the driver was DUI, or possibly looking into his rear-view mirror knowing Bundy was following.  As a result, he conducted a traffic stop to make contact with the driver.

Bundy made contact with Raileanu and a female in the front passenger seat.  He advised Raileanu of the reason for the stop and asked if he had been drinking.  Raileanu responded that he had not been drinking and that he was driving to Utah.  Bundy asked Raileanu about his behavior at the gas station.  Raileanu said that he did not have a driver's license and was afraid of getting pulled over which is why he was acting strangely at the gas station.

Raileanu told Bundy he was on his way to Utah.  When asked where he was going in Utah, Raileanu said he was going to a ski resort to snowboard.  It was approximately 10:30 p.m.  Bundy did not observe any ski clothes or any other clothing in the vehicle.  Bundy asked Raileanu what ski resort he was going to, and Raileanu responded that he did not know, but that he was just following his GPS.  Raileanu then said he was meeting a friend at the ski resort, they were going skiing, and Raileanu was going to call his friend when he got there to give him better directions.

Bundy did not observe any luggage or ski paraphernalia in the passenger compartment or on the roof of the vehicle.  Based on Raileanu's responses and Bundy's prior training and experience, Bundy believed that there was something illegal on Raileanu's person or that he had a warrant out, "or that something else was going on."  He asked Raileanu if he would get out of the vehicle to speak further away from the female passenger.  Raileanu complied and came to the front of the patrol vehicle to speak with Bundy alone.  Raileanu repeated his story that they were traveling to Utah to go skiing.  Bundy believed that there was something illegal in the vehicle or that something else was going on and asked Raileanu for verbal consent to search the vehicle for drugs, alcohol, or any illegal contraband.  Raileanu gave verbal consent to search the vehicle.

During Bundy's contact with Raileanu, both were speaking in English.  Raileanu responded in English, appeared to understand the questions, provided the appropriate responses to questions, and did

1   not ask for an interpreter.  Raileanu did not state that he did not understand what Bundy was saying or

2   what was happening.

3        Bundy called for backup because he was alone, there was another passenger in the vehicle, and

4   he never searches vehicles alone.  A couple of minutes later, Officer Averett arrived on scene.  Once

5   Officer Averett arrived, Bundy asked the female passenger to get out of the vehicle to talk with him.

6   She complied.  Raileanu was standing near the front of Bundy's patrol vehicle approximately fifteen

7   feet from the back of the Mercedes.  The female passenger stood next to Bundy.  Raileanu and the

8   female were separated, but both could hear him if he was talking and see what he was doing.  Bundy

9   did not tell either of them that they were under arrest, or that they would be arrested if they did not

10  consent to a search of the vehicle.  Bundy did not threaten to get a warrant if they did not consent to a

11  search of the vehicle.  Bundy was armed, but did not unholster his weapon at any point during the

12  encounter or make any physically aggressive movements to Raileanu.  At no time during the search of

13  the vehicle did Raileanu state he was withdrawing his consent to search or ask that the search be

14  stopped.

15       Bundy began searching the vehicle, approaching it on the passenger side.  Officer Averett

16  approached the front of Raileanu's vehicle on the driver's side where he could look at the vehicle and

17  still keep eyes on Raileanu and the female passenger while Bundy searched.  Bundy opened the latch of

18  the front center console and located what appeared to be thirty to forty-five pre-paid Visa debit cards.

19  They all had the same appearance.  Each card had different sixteen-digit numbers on each of the cards,

20  but all had the same expiration date.  Bundy looked through the cards and observed a piece of tape on

21  them.  There were several four-digit numbers that were crossed out and other four-digit numbers which

22  were not crossed out on each of the cards.  Bundy concluded that they were possibly stolen cards or

23  fraudulent cards.  He continued to search the vehicle, and in the rear passenger-side floor board

24  observed a small leather purse or bag.  He looked inside the bag and found numerous more of the same

25  credit cards or debit cards with the same or similar appearance.

26       Bundy gave Officer Averett a couple of the cards, and Averett went back to the patrol vehicle to

27  begin investigating.  Bundy began interviewing the female passenger and Raileanu regarding what he

28  had observed inside the vehicle.  He spoke primarily with the female passenger who was approximately

7

fifteen to twenty feet away from Raileanu so that their conversation could not be easily heard.  Bundy advised the female of her *Miranda*, rights, and she agreed to speak without an attorney present and to answer questions.  Specifically, he advised her that she had the right to remain silent, that anything that she said could and would be used against her in a court of law, that she had a right to an attorney, and to have an attorney present during questioning.

Bundy asked the female if she knew about the cards inside the vehicle, and she said she had no idea about them.  Bundy also asked the female where they were going.  The female responded that all she knew was that they were going skiing in Utah.  She did not know where they were going, or who they were going to meet.  The female identified herself as Raileanu's girlfriend, Liudmila Dopca. Bundy conversed with Ms. Dopca in English, and she appeared to understand.  She responded appropriately.

After speaking with Ms. Dopca, Bundy spoke with Raileanu and advised him of the same *Miranda* rights he gave Ms. Dopca.  Raileanu agreed to speak with Bundy without an attorney present and said he understood his rights.  Bundy began questioning him about the debit cards.  Raileanu said that he and Ms. Dopca lived in Las Vegas.  Raileanu claimed he met an unidentified male at a gym where he works out.  The unidentified male asked Raileanu if he wanted to make extra money and offered to pay him $500 if Raileanu took a bag to an unknown location in Utah.  The unidentified male told Raileanu that he would give Raileanu $500 and a bag, and once the bag was delivered to the location in Utah, Raileanu would be paid another $500.  Raileanu said he did not know where he was going to deliver the bag, and that he was supposed to call the phone number given to him when he got to Utah to get the directions.

Raileanu told Bundy that the unidentified male told him not to look inside the bag; however, Raileanu did so anyway because he wanted to make sure there was not cocaine inside the bag.  Raileanu told Bundy he looked inside and saw debit cards or credit cards and that he did not know what they were for.  Raileanu also told Bundy that when Raileanu observed Bundy at the gas station, he separated some of the cards from the bag and put them inside the center console to try to conceal them.

It was cold outside, and everyone was wearing light jackets.  Bundy asked Raileanu if he and Ms. Dopca would drive in their vehicle to the justice facility where they could talk further and continue

the investigation inside a warm building.  Raileanu agreed.  Officer Averett drove to the justice facility approximately one-and-a-half miles from the stop.  Raileanu drove behind Averett, and Bundy followed in his vehicle.

Bundy contacted Homeland Security because dispatch advised him that Raileanu had a previous ICE detainer out of Las Vegas.  Additionally, Bundy believed Raileanu was in possession of stolen or fraudulent cards.  Bundy spoke with Special Agent Adams and advised him of the credit cards with the four-digit numbers on them.  Adams stated that it sounded like there was stolen data on the cards and that he would respond to complete the investigation and interview Raileanu.  Adams was in Las Vegas and arrived approximately an hour and a half later in Mesquite.

Ms. Dopca was sitting in the front lobby while Raileanu was placed in the multi-purpose room with a table and several chairs.  The door was open.  There was "normal conversation, but no talk about the credit cards or anything criminal of nature."  Both Raileanu and Ms. Dopca were given food.  Raileanu was periodically allowed to have contact with his girlfriend while awaiting for Agent Adams.  They were given a brief opportunity to speak, but the officers did not want them speaking in their native language and made sure they spoke English.

When Agent Adams arrived, Bundy told him what had happened, showed him the cards, and briefed him on the initial contact and reason for the stop.  Adams took over.  Bundy's sergeant was inside the multi-purpose room with Raileanu while Bundy stood outside the door.

On cross-examination Bundy testified that after passing the Terrible's gas station, he pulled into the RV parking lot so that he would be able to see the Mercedes leave.  By the time Bundy made a u-turn and pulled behind the vehicle, there were very few cars on the road.  Mesquite is a small city.  Bundy was not focusing on the Mercedes other than it was on the road.  Bundy could not observe Raileanu after he passed the gas station and looped around.  However, after Bundy headed northbound on Riverside, he observed Raileanu peering around the corner of the convenience store twenty to twenty-five feet away from the front door of the building.  I-15 traffic could be observed from where Raileanu was standing.  Bundy only maintained visual contact with Raileanu for a few seconds before making a left-hand turn to go westbound on West Mesquite.  Bundy could not observe Raileanu get

/ / /

9

1  back into the car or what he was doing while Bundy was parked in the RV parking lot.  Raileanu

2  appeared to be looking at Bundy while peering around the building at the gas station parking lot.

3  Bundy hid his patrol car in the RV park so that he could follow Raileanu and make a stop.  At

4  this point, Bundy intended to stop the vehicle and find out what the driver was up to.  Bundy followed

5  Raileanu's vehicle after it passed him heading westbound on West Mesquite Boulevard towards the I-

6  15 on-ramp.  Before getting to the on-ramp, there is a roundabout that goes off in multiple directions.

7  Bundy did not stop Raileanu before he got onto the freeway because Bundy was waiting until Raileanu

8  was a bit further down the road to observe his actions.  Bundy did not know in which direction Raileanu

9  would be traveling, whether he would head north or south on the freeway or go to nearby casinos.

10 Bundy wanted to observe Raileanu's traffic pattern to see if he was possibly DUI, swerving, or crossing

11 onto oncoming traffic.  His practice when following a possible DUI driver is to allow the vehicle to get

12 it further ahead where he can still maintain visual contact.  Stopping somewhere on West Mesquite

13 Boulevard would have been safer than stopping somewhere on I-15.

14 Bundy did not observe anything erratic about Raileanu's driving while he was in Mesquite

15 before getting onto the northbound ramp to I-15.  Bundy continued to follow Raileanu's vehicle with

16 the intent to stop him.  Within a quarter of a mile on I-15, Raileanu's vehicle touched the fog line three

17 times.  There are a number of foot-long ruts within inches of the fog line in this area of the roadway.  A

18 driver crossing the fog line would notice the tires bouncing and the suspension react as he hit the ruts in

19 the road.

20 There was nothing erratic about the way Raileanu pulled over for the stop.  Bundy told Raileanu

21 that he was pulled over because of the suspicious behavior Bundy saw at the Terrible's gas station, and

22 for failing to maintain travel lanes by crossing into the fog line.  Bundy learned that Raileanu's pregnant

23 girlfriend was in the car.  Bundy asked Raileanu for his license and registration, but did not recall

24 looking at the paper he provided.  Bundy did not recall conversation with either Raileanu or Ms. Dopca

25 about whether Raileanu had an international driver's license.  Both had Nevada identification cards,

26 which is how Bundy identified them.

27 Bundy did not recall that the girlfriend was trying to translate from the car.  Raileanu appeared

28 to understand what Bundy was saying.  Raileanu did not ask questions to demonstrate he did not

1  understand or state he did not understand.  Raileanu had an accent, but he did not appear to have any
2  difficulty understanding what was being communicated.

3       Based on Bundy's training and experience, people engaged in criminal activity sometimes make
4  up a story of what they are doing when stopped.  Bundy believed that is what Raileanu and Dopca were
5  doing.  Bundy did not believe what Raileanu was saying about the trip and suspected there were drugs
6  or contraband or something illegal in the vehicle.

7       Officer Averett is a K-9 officer.  When he arrived at the scene, he had his dog.  After Bundy
8  searched the vehicle, the dog did a search of the perimeter of the car and interior which turned up
9  nothing.  Bundy estimated Averett was on the scene within approximately ten minutes of the stop.
10  Bundy estimated he called for backup three or four minutes after the initial contact and possibly sooner.
11  Bundy reviewed his own radio log summary and that of Officer Averett.  From reviewing the logs, his
12  traffic stop was conducted at 22:21 hours, and it appeared that Averett arrived at 22:29 hours.  Bundy
13  did not know whether the times contained on the logs were automatically set up from dispatch, or if
14  dispatch typed the numbers in.

15       After the traffic stop, Bundy asked Raileanu to get out of the vehicle and come to the front hood
16  of the patrol car.  Bundy asked Raileanu if he could pat him down for weapons.  Raileanu's hands were
17  behind his back while Bundy patted the exterior of Raileanu's clothing down for weapons.  Bundy
18  asked to pat Raileanu down for his safety because Raileanu had on a large black coat, and Bundy could
19  not see Raileanu's waistband.  Raileanu did not complain or say he did not want to be patted down.
20  Bundy could not recall if the coat was thick or thin, but testified it was "a puffy black jacket."  Bundy
21  did not recall having Raileanu keep his hands behind his back.  He normally does not force people to
22  keep their hands behind their back during a patdown.  Bundy remained with Raileanu until Averett
23  arrived.  Bundy asked Raileanu if there was anything illegal inside the vehicle–any drugs, weapons, or
24  contraband.  He asked these questions to see Raileanu's response.  Sometimes people admit they have
25  drugs in the car.  Bundy asked about drugs or contraband because he believed Raileanu was lying about
26  his destination and purpose for traveling.  By this time, Bundy did not believe Raileanu was DUI.

27       Bundy carried a written consent to search form with him, but he did not present a card for
28  Raileanu to sign.  When asked why, he testified "it just didn't happen."  Bundy gave Raileanu *Miranda*

1  warnings from memory and did not recite them from a card.  Bundy acknowledged that when he

2  testified about the *Miranda* warnings that he administered to Raileanu and Dopca he left out the advice

3  that if they could not afford an attorney, one would be appointed for them.

4  Bundy did not issue any traffic citations as a result of the stop.  Bundy was the only officer to

5  conduct a physical search of the vehicle.  He searched before Officer Averett had his dog search around

6  and throughout the car.  Bundy located the cards in the bottom of the center console.  He recalled they

7  were just randomly in there rather than being stacked neatly.  He observed approximately thirty cards,

8  which is not a common thing to see.  The cards were Visa debit or gift cards.  He concluded they were

9  contraband because of the number of them, and the fact that each of them had several four-digit

10 numbers that were crossed out like they were PIN numbers, and other four-digit numbers that actually

11 worked.  They all had the same expiration date but different numbers and looked suspicious and not

12 like a normal credit card.  There were no names on any of the cards.

13 Bundy did not get separate consents to search the bag on the back passenger floor board.  Bundy

14 estimated it was approximately forty-five minutes to an hour from the time of the initial stop to the time

15 Raileanu and Dopca were asked to go to the justice facility.  He estimated he found the cards in the car

16 within twelve to twenty minutes of the stop.  Bundy testified that Raileanu and Dopca were free to leave

17 before he discovered the cards because up until that time he did not have any reason to stop them from

18 leaving.  However, he did not tell them they were free to leave.  Bundy recalled that at the time he asked

19 Raileanu for consent, Raileanu's registration and Nevada identification were on the windshield of the

20 patrol car.  Bundy did not recall that these documents were given back to Raileanu after they were run

21 through dispatch.  Raileanu and Dopca were asked if they would drive to the justice facility to get out of

22 the cold.  However, Bundy acknowledged that they were not free to leave and that one patrol car was

23 positioned in front and the other behind Raileanu's vehicle.  The choice was whether they would remain

24 in the cold at the scene or at the justice facility where it was warmer.  By this time, Bundy knew he was

25 going to call Homeland Security and would continue with the investigation.  Neither Raileanu nor

26 Dopca were free to leave.

27 At the justice facility Dopca and Raileanu were placed in different locations.  Ms. Dopca was

28 placed in the lobby area, and Raileanu was placed in the multi-purpose room.  From what Bundy

1  recalled, the door to the room remained open although there was always someone in there.  The door

2  could have been closed at some point, but Bundy did not recall.  While waiting for Agent Adams,

3  Raileanu was brought food and water.  Bundy did not recall the conversation Adams had with Raileanu

4  because he was standing outside the door and was in and out.

5        After the gift cards were found in a search of the vehicle, the sergeant on shift arrived at the

6  scene.  Bundy did not specifically recall, but he believed he learned that Raileanu had a previous ICE

7  detainer within fifteen or twenty minutes of the search of the car.  He did not recall the specific

8  information given to him by dispatch about the ICE detainer.  Bundy arrested Raileanu for possession

9  of credit cards without the owner's consent.  Those charges were not pursued in the state court.

10        **B.**    **Testimony of Officer Quinn Averett**.

11        Averett has been an officer with the Mesquite Police Department for a year and a half.  He was

12  on duty January 13, 2013, in uniform in a marked vehicle.  Officer Bundy asked him to respond to a

13  traffic stop as a cover officer or a backup.  There were only three or four patrol officers on duty that

14  night.  He reviewed his radio log and Officer Bundy's radio log before testifying.  The radio log

15  contains information that officers passed through dispatchers.  Dispatchers enter information into a

16  computer system, and it goes into a radio log.  Officers can also update the log themselves with a

17  mobile data center in the patrol vehicle.  Officer Bundy initiated the stop at 22:21 hours.  Averett

18  arrived at 22:29 hours, approximately eight minutes later.

19        When Averett arrived, he observed a male standing outside the vehicle with Officer Bundy.

20  Officer Bundy advised Averett that he had reasonable suspicion that there was criminal activity

21  happening with the vehicle and that he had obtained consent from the driver to search.  Bundy asked

22  Averett to provide cover and backup while he did so.  After Averett arrived, the female in the passenger

23  seat was asked to get out of the vehicle.  She stood in front of Officer Bundy's vehicle and the male

24  stood off to the side.  Averett stood by Officer Bundy to provide cover watching the male and the

25  female while Officer Bundy searched the vehicle.  The Defendant was ten to fifteen feet away from his

26  vehicle and could observe what Bundy was doing.

27        At no point did Raileanu withdraw his consent to search.  Bundy showed Averett a brown bag

28  that had multiple credit cards in it.  The cards said Bank Vanilla or Vanilla One or something like that.

1   They all had tape on them with four-digit numbers, which he assumed were PIN numbers.  Averett
2   asked for a couple of them so that he could call the credit card law enforcement number and ask if the
3   numbers were valid or fraudulent.  The cards seemed odd because the expiration date was far out, and
4   Averett did not remember that there were names on the cards.  Averett was transferred and put on hold
5   and unable to speak to a representative of the credit card company before Officer Bundy said they were
6   going to get out of the cold and go to the justice center lobby.

7   Before the male and female were put back in their vehicle, Averett retrieved his K-9 partner and
8   did an exterior and interior K-9 sniff of the vehicle.  The dog did not alert to any type of drug odor and
9   was put back in Averett's car.  The dog walked by Raileanu.  Averett described him as a happy, tail-
10  wagging, non-aggressive dog.  From a review of the log, it appears they left the scene to go to the
11  justice center at 22:54 hours and arrived at 23:01 hours.  Averett remained at the justice center until
12  Agent Adams arrived.  Raileanu was not in handcuffs or placed behind locked doors at any point.
13  Raileanu was allowed to periodically have contact with his girlfriend, and both were provided with food
14  and drinks as they requested.  Raileanu asked to speak with his girlfriend two or three times and was
15  allowed to walk out to the room and talk to her while the officers stood there and watched.  Averett
16  believed Raileanu and Ms. Dopca were provided apples, sandwiches, and water or perhaps juice.
17  Averett's job was just to sit there and watch them.

18  Averett had a casual conversation with Raileanu while waiting for Adams.  Both officers asked
19  Raileanu questions about where he was from and things like that.  It was a relaxed, casual conversation
20  "joking around with each other."  Raileanu has an accent, but the officers understood everything he was
21  saying.  Raileanu appeared to understand questions and responded appropriately.  He did not ask for an
22  interpreter at any time or ever indicate that he did not understand English.

23  When Agent Adams arrived, Adams looked at the cards and had a tool with him that he used to
24  scan them to verify the status of the cards.  Averett was out in the hallway while Adams spoke with
25  Raileanu.  Bundy was also in the hallway although he may have come in and out of the room.  The
26  sergeant was also present.  Although the officers had firearms, at no point during their encounter with
27  Raileanu did an officer unholster his weapon.  Averett described the atmosphere as very relaxed and
28  amicable.  The officers were friendly with Raileanu, and Raileanu was friendly with them.

On cross-examination, Averett testified that the environment along the roadside was also friendly. Officers try to treat people with respect, the way they would like to be treated.

Averett believed Agent Adams arrived at the justice center at approximately 3:00 or 3:30 a.m. The logs do not reflect what time Adams arrived.

Averett acknowledged Mr. Raileanu and his girlfriend had no choice but to go to the justice facility because they were not free to leave. They were being held in investigative detention at that point. Averett's K-9 partner is a Belgian Malinois named Noro. The dog searched the exterior and interior before Raileanu and his girlfriend got back in the vehicle. The dog is only trained to detect drug odors. At no point were Raileanu or Ms. Dopca advised they were free to leave. Averett was advised by Officer Bundy that consent to search the vehicle was given by both Ms. Dopca and Mr. Raileanu. A separate consent to search was not obtained for the dog searching the car.

### C.     Testimony of Agent Michael Adams.

Adams is a special agent with Homeland Security Investigations ("HSI") in Las Vegas and has been so employed for over two years. As a special agent with HSI, he investigates crimes against the United States that relate to drug smuggling, weapons smuggling, human smuggling and trafficking, financial violations, computer crimes, and violations related to the Immigration and Naturalization Act. He was an agent with the United States Secret Service for eleven years before joining HSI.

He was the duty agent for HSI on January 13, 2013, when he received a call from Officer Bundy of the Mesquite Police Department. Bundy advised that he had stopped Raileanu and in the course of his investigation had been notified by his dispatch that there was a prior immigration contact with ICE. Additionally, Bundy had recovered numerous cards that he believed were some sort of unauthorized credit cards. Adams got dressed, notified his chain of command, and drove to Mesquite arriving at approximately 1:00 - 1:15 a.m. at the justice facility. When he arrived, he observed a couple of marked patrol units and the black Mercedes that Raileanu had been driving. He entered the building and observed Ms. Dopca sitting in the lobby. A couple of officers were in the building and told him that Raileanu was in the multi-purpose room adjacent to the lobby. Bundy and Averett were there as well as their sergeant.

///

1    Adams made contact with Bundy, who updated him on the situation.  Adams had a magnetic
2  track reader used for reading credit card information on the backs of encoded cards.  He examined the
3  cards and determined, based on his training and experience, that they had been re-encoded.  The
4  magnetic information on the rear of the cards did not match the embossed information on the front of
5  the cards.  On each card there was a small, white sticker with a series of numbers that had been listed in
6  a descending order with the top numbers having been scratched out and a number at the very bottom
7  that had not been scratched out.  He has seen cards similar to this numerous times in his employment.
8  Cards with stickers and four-digit numbers on the front are usually the PIN numbers relating to a debit
9  card or the PIN number for a credit card.  When he determined that the cards were re-encoded, he
10  concluded that they were counterfeit.

11    Adams first made contact with Raileanu when he entered the multi-purpose room.  The door
12  was open when he entered.  Adams was in plainclothes and had a weapon, but it was not visible.
13  Officer Bundy was standing just outside the door.  Averett may have been in the room, and their
14  sergeant was leaning up against the wall.  All of the officers had holstered firearms.  At no point were
15  the firearms removed from their holsters.  Adams did not make any physically threatening movements
16  to Mr. Raileanu and did not observe anyone else do so.

17    Adams asked Raileanu if he could ask him some questions.  Adams also asked the officers if
18  Raileanu had been mirandized, and they indicated he had.  Adams addressed Mr. Raileanu and said that
19  he had previously been advised of his *Miranda* rights, and they were still in effect.  However, Adams
20  re-advised Raileanu of his *Miranda* rights.  Adams asked Raileanu if he understood his rights and if he
21  was willing to waive his rights and speak.  Raileanu nodded, and Adams asked for a verbal yes to both
22  questions.  Raileanu answered yes.  Adams then told Raileanu that he did not have to say anything he
23  did not want to say.

24    After Raileanu was given his *Miranda* rights and waived them, he told Adams that he works out
25  at the Las Vegas Athletic Club at I-215 and Eastern.  He had an acquaintance named Bill who worked
26  out with him.  Bill approached him about transporting an item to Utah and offered to pay him
27  $1,000–$500 up front and $500 upon delivery.  The conversation with Bill took place two days before
28  the stop.  The next day, January 12, 2013, Bill provided Raileanu with the bag that Officer Bundy

1  recovered.  Bill instructed Raileanu not to open the bag and provided Raileanu with a cell phone

2  indicating that there was a phone number in it.  Raileanu was supposed to call the phone number when

3  he arrived in Utah, and another individual would come out and meet him and take the bag and cell

4  phone.  Adams asked Raileanu if he looked in the bag.  Raileanu said he did because he was concerned

5  that there might be a bomb or narcotics in the bag.  Raileanu said he opened the bag and saw the credit

6  cards.  Raileanu told Adams he believe they were probably stolen and that Bill did not want to chance

7  mailing them, so he was paying to have them transported on his behalf.

8       Raileanu also told Adams that he met Bill at a Starbucks or coffee place near the gym.

9  However, Raileanu could not provide any type of description of the car Bill drove and described Bill as

10 essentially looking like Adams.

11      Adams observed that Raileanu was nicely dressed with expensive jeans and a NorthFace jacket.

12 During the interview, Adams insinuated that Raileanu was using counterfeit cards and using the

13 proceeds for clothes and to drive a nice car.  Raileanu became angry and told Adams that Adams did

14 not know anything about him.  Raileanu said he was in the business of buying and selling salvaged

15 vehicles at auction.  He stated that he repaired the vehicles and sold them.  Raileanu told Adams this

16 could be a lucrative business, and it was how he got money to live on.

17      Adams estimated that his interview with Raileanu lasted at least an hour and a half or longer.

18 The interview was broken up.  After he received some information from Raileanu he stopped and made

19 contact with Ms. Dopca.  Adams asked Ms. Dopca about the events up to that point, what she

20 remembered, what she had seen, why they were traveling, as well as questions about her presence in the

21 United States.  He needed to determine whether she was lawfully present in the United States.  Dopca

22 said that she had been told by Raileanu that they were going skiing in Utah.  She said she did not know

23 where.

24      Adams also asked Raileanu about where he was going skiing.  Raileanu kept reiterating over

25 and over again it was programmed in the GPS.  Adams' interview with Raileanu was in English, and

26 Raileanu responded in English.  At no point did Raileanu ask for an interpreter or indicate he did not

27 understand.  Raileanu's information was responsive to Adams' questions.  Based on Adams' training

28 and experience, Raileanu's reaction to Adams' insinuation that he was engaged in criminal activity

1  indicated Raileanu had a good grasp of English.  Raileanu had a thick accent and mispronounced

2  certain words, but Adams was able to understand him without difficulty.

3      During the interview, Adams asked why some of the cards were in the bag and some were in the

4  center console.  Raileanu responded that he had observed the officer behind him and had removed some

5  of the cards from the bag and placed them in the center console trying to push them down assuming the

6  officer wouldn't look there if the vehicle was searched.

7      After the interview, Adams called AUSA Frayn to discuss the case.  At that time, the Mesquite

8  officers placed Raileanu under arrest for possession of credit card without the owner's consent.  A

9  correction officer came out and placed Raileanu into custody.  Adams went back into the jail for

10 processing purposes.  Raileanu and Dopca are from Moldova, a mandatory notification country for

11 consular notification.  As a federal agent, Adams is required to notify the consulate that Mr. Raileanu

12 was arrested.  Adams met with Raileanu while he was in the holding area and explained the notification

13 form and procedures.

14      Ms. Dopca was not detained.  Adams determined that she was originally in the United States

15 under a student visa beyond the date of required departure.  She was not lawfully in the United States.

16 However, during the interview with Mr. Raileanu, he was constantly concerned for Ms. Dopca and said

17 she was pregnant, and he was worried for her.  When Adams interviewed Dopca, she also said she was

18 pregnant.  Adams had certain discretion and decided on humanitarian grounds not to take her into

19 custody immediately for immigration processing.  He made arrangements for her to come to his office

20 the following day to be processed for removal, and she did.  She left in the same vehicle that they had

21 been stopped in.

22      Adams obtained a written consent to conduct a forensic examination of the GPS unit in the

23 vehicle from Ms. Dopca when she went to his office.  Adams explained that if Raileanu had been

24 approached by another individual, the investigation was still ongoing, and it could potentially provide

25 information that might either exonerate Raileanu or limit the scope of his criminal conduct.  He

26 explained that having the address and being able to follow up and find if there were other individuals

27 involved was something investigators try to do.  Dopca signed the written consent to search form in

28 Adams' office.  Chris Hedges, another officer, was also present.  Dopca wanted the GPS physically

1  returned to her after the forensic examination because she needed it to get around Las Vegas.  An image

2  was taken of the GPS unit, and it was returned to Dopca.

3       Adams reviewed the forensic image of the GPS and did not find any destinations in Utah

4  relating to ski resorts programmed in it.  The GPS information showed the route of travel from the area

5  where Raileanu and Dopca lived to Mesquite, and there was nothing past that on it.

6       On cross-examination, Adams testified that he ran six to ten of the credit cards through his

7  magnetic reading device.  He described the cards as vanilla prepaid Visa cards that can be loaded with

8  money on them.  The numbers on the rear of the card did not correspond with the embossed numbers on

9  the front.  Followup investigation indicated they belonged to British banks and were ATM debit cards.

10  Adams was not able to determine whether any of them were loaded.  He considered the cards

11  counterfeit because the numbers belonged to legitimate ATM accounts in Britain.  It is possible that the

12  cards had no value on them.  He has not been able to determine whether any of the cards have been

13  used by anyone.  The information was passed to British authorities, and he is still waiting for a

14  response.

15       Adams first saw Raileanu in the multi-purpose room, and the door was open.  It is Adams'

16  practice to administer *Miranda* warnings even when another officer has done so.  He administers

17  *Miranda* warnings so that he knows he did it and can put it in his report later.  Adams was not aware

18  until he heard Officer Bundy testify that Bundy did not advise Raileanu that if Raileanu could not afford

19  an attorney that one would be appointed to represent him prior to questioning.  Adams always asks for a

20  verbal response to an acknowledgment and waiver of rights.  Raileanu nodded in the affirmative, and

21  Adams asked him to verbally respond.  Raileanu verbally acknowledged he was waiving his rights and

22  willing to talk.  Adams believed Raileanu understood.  His practice is to always followup after *Miranda*

23  warnings by telling individuals they do not have to talk with him.  Adams told Raileanu he did not have

24  to say anything and could just sit there and listen to questions and did not have to answer.  He does this

25  from years and years of habit of doing everything the same way in an abundance of caution.

26       A federal search warrant was executed on the prepaid phone Raileanu had.  It contained multiple

27  phone numbers and personal photos of Raileanu when he was in Moldova.  Raileanu did not give

28  / / /

19

Adams the phone number of the individual Raileanu was supposed to call when he arrived in Utah. Raileanu stated he did not know what it was and that the number was programmed into the phone.

During the interview with Raileanu, Adams was aware that Raileanu was concerned for Ms. Dopca's well-being because she was pregnant.  Raileanu was not brought before a federal magistrate until a day or two later because he was not in federal custody.  Adams could not arrest Raileanu federally without an arrest warrant, and he did not.  Adams and another officer picked Raileanu up from the Clark County Detention Center and assumed custody at that point.  Until then, Raileanu was in state custody.  Adams does not have state arrest authority.  Raileanu was arrested for possession of a credit card without owner's consent by the Mesquite officers.

Ms. Dopca came into the office and signed the written consent for the GPS unit on January 16, 2013.  Adams asked for consent because he was conducting an investigation and had an obligation to determine if Raileanu was only a runner and someone else was involved who was more culpable. Adams and his partner got verbal consent and had the written consent form signed after the GPS was removed from the car.  Dopca accompanied Adams and his partner to the vehicle and returned with them to the office.  Adams and his partner sat down with Dopca with the form and went through it with her.  Adams asked her to read the form and had her execute it.  Defense counsel asked whether Dopca questioned whether she could refuse and whether Adams responded that she could not or he would get a warrant.  Adams denied this occurred.

The written consent to search the GPS was done in the office after the unit was retrieved because Adams needed the serial number from the unit to put on the form.  However, the serial number had been removed.  No search was conducted until Dopca had signed the form.  Adams did not have Dopca sign the consent form before the unit was taken from the vehicle because he needed the serial number.  In Adams' opinion, entering a serial number after a consent form has been signed is not a good thing to do because "then you're altering something she's already signed."  This is not something that he would do.

Adams reiterated that Dopca gave verbal consent and then signed the written consent form after the unit was removed from the vehicle.  She never said she was not okay with a copy being made or

/ / /

20

1   questioned whether she could refuse to consent.  He did not tell Dopca he would get a warrant if she did

2   not consent.

3          Adams and his partner picked Raileanu up from the Clark County Detention Center to drive him

4   around the corner to the federal courthouse and deliver him to the custody of the U.S. Marshal's

5   Service.  Adams explained to Raileanu that he would meet with Pretrial Services and be assigned an

6   attorney if he did not have one.  It is a very short distance from the Clark County Courthouse to the

7   federal courthouse.  Neither Adams nor his partner asked Raileanu any additional questions en route.

8   They dropped Raileanu off at the U.S. Marshal's Service and went to the U.S. Attorney's Office to meet

9   AUSA Frayn to get the complaint signed by a magistrate judge.

10         **D.     Testimony of Mila Dopca.**

11         Ms. Dopca was in the courtroom in violation of the court's order excluding witnesses during the

12  second day of the evidentiary hearing.  Counsel for Raileanu indicated he was not aware that Ms. Dopca

13  had been in the courtroom.  Mr. Palazzo indicated that he had told Ms. Dopca at the prior hearing to

14  remain outside, but he did not realize that she arrived late to court and was in the back row of the

15  courtroom.  The court allowed Ms. Dopca to testify over the government's objection.

16         The court noted for the record that Ms. Dopca had been in the courtroom virtually the entire

17  time of the second day of testimony.

18         Raileanu is Ms. Dopca's boyfriend.  On January 13, 2013, she and Raileanu were stopped in

19  Mesquite on I-15.  They were on their way to ski and stopped in Mesquite at a Terrible Herbst

20  convenience store because she was hungry.  Raileanu parked the car near the doorway to the

21  convenience store and went in.  Raileanu was in the store a few minutes before coming out and telling

22  her there were sandwiches and cold food which she did not want.  She and Raileanu were looking at the

23  GPS to figure out which way to go for a couple of minutes.  They headed toward the interstate ramp to

24  northbound I-15.  Dopca was holding the GPS unit up to the window because the internet connection

25  was bad.  Raileanu was driving slowly while Dopca was holding the GPS because he did not know

26  which way to go.

27         They were stopped shortly after getting on I-15.  She did not remember the car vibrating.  An

28  officer came to Raileanu's side of the car.  Dopca was trying to listen to what the policeman was asking

to ask to help Raileanu answer because sometimes Raileanu misunderstands.  Dopca translated for a couple of minutes until the officer asked for identification.  The identification was provided with the registration.  The officer had Raileanu get out of the car.  She remained inside the car.  She heard Raileanu "talking, talking, talking."  Dopca knows that when Raileanu is "talking, talking, talking, that mean he's not understanding what they want."  She tried to tell the officer that Raileanu was not understanding by yelling from the window, but no one heard her.

Another officer came to her side of the car, opened the door, and told her to come out.  She did as she was told.  When she got out of the car, she did not hear any interaction between Raileanu and the other officer.  She was approximately ten or twelve feet away.  The officer moved Raileanu about twenty-five feet away so that she could not overhear.  Dopca asked the taller officer if she could help.  The officer declined.  She did not know which officer had the dog.  The dog went into the car twice after the officer searched the car.

One of the officers asked Raileanu to get in the car and go to the police station because it was cold outside.  The officers said they wanted to ask some questions.  Raileanu asked if they were arrested.  The officers said no and started talking with Raileanu.  Dopca recalled that Raileanu's answers were "total different" to some questions, and she tried to interrupt, but the officer told her to shut up.  She got angry.  She asked, "Are we arrested, yes or no?"  Raileanu also asked if they were arrested and was told no.  Raileanu said, "Okay, let's go.  Let's go home," and the officer said, "No, you can't leave."  The officer told them that they were not under arrest, but if they did not go, the officers said, "We'll force you."  She felt they had no choice and were pressured.  At this point the officer still had all of her identification information.

At the justice facility, Dopca and Raileanu were both in one room, and the officer saw that Raileanu hugged her.  They came and told her to stay in the lobby and took Raileanu to a little room.  Raileanu stayed in a little room with the door shut while the officers talked with her.  The door was shut all the time.  She went to the restroom and tried to see how he was doing, but she could not see Raileanu because the door was shut.  There was no window in the door.   She received her ID back while still in Mesquite.  She did not recall what time she was allowed to leave, testifying she was crying a lot and hungry.  However, it was sunrise when she got back to Las Vegas.

On January 16, 2013, she went to Agent Adams' office.  Before that, she had gone to the Clark County Detention Center to get the insurance, registration, and other papers for the car so she could drive.  She also picked up Raileanu's ID and a gold cross necklace.

At Adams' office, she passed through security and went upstairs to meet with Adams and was asked for her ID to put her information into the computer for immigration purposes.  Adams asked her if she had the GPS in the car and she said yes.  Adams said he needed the GPS, and she would go get it.  Adams and the other officer came downstairs with her to the parking lot.  She gave them the GPS unit, and they went back upstairs in a little room.  They gave the GPS to another employee.  After that, they processed all her information in a computer, and another agent took her in a room to question her.  The agent was nice, but she felt pressured.  She was trying not to think about what happened, that she was pregnant, and the agent was "remembering me about everything."  The agent said things like she was alone, she did not have anybody, and he asked her what she was going to do.  This made her feel "more bad and stressful."

She was crying, and the agent tried to talk about music and other topics.  Later, she was taken to a little room where pictures were taken before they brought her a paper.  She identified the paper Adams brought into the room as the consent form she signed.  Adams told her she had to sign and put the date.  She started reading everything and asked whether it was to search her property.  Adams said no, it was for the GPS.  She said that was okay and kept reading, but then said she could not sign it.  Adams took the pen away and said that if she was not going to sign it "we'll force you to sign."  The form said it was voluntary and that she had the right to refuse to consent to search.  When she saw that she thought she could refuse and told Adams she could not sign it.  She reiterated that Adams told her that if she was not going to sign it, "We'll force you, and you will sign it."  She was scared so she signed it even though she did not want to.  She felt intimidated and threatened into signing the form.  When she returned to her car, she sat in it with the engine running for a couple of minutes to calm down "because like I thought the USA is like democrat.  Why everybody can force us to do something, so."

On cross-examination, Dopca acknowledged that she was present at the prior hearing and was asked to wait outside.  She was running late and did not know the rules.  She sat in court on the second day of the hearing because when she was in Mesquite court, "Nobody told me nothing."

On January 13, 2013, she left Las Vegas for Mesquite after work at approximately 9:00 in the evening.  She and Raileanu decided to go skiing the night before.  They were going to Brianhead.  She did not know that they were going to meet someone.  They had been to Brianhead before with friends.  However, she could not remember where they were going when the officers asked her.  She had clothes, glasses for skiing, a hat, and gloves in a gym bag with other personal items.  The gym bag was in the trunk when they were pulled over.  The officers opened the trunk.  The trunk of the Mercedes is very small.  The officer looked in it with a light.  Her purse was inside the vehicle.  The plastic cards were in a different bag.  Her purse was the only bag in the passenger compartment of the vehicle.  She did not know that the bag with the credit cards in it was in the back of the car.  When she got in the car she threw her purse in the back.  Raileanu also had luggage in the car.

She and Raileanu observed the police car when they pulled into the gas station.  They did not see the patrol car before they pulled into the gas station.  Although she was hungry, Raileanu did not buy her any food.  Raileanu went around the other side of the building because they saw the police car go there, and it indicated which way they had to go.  The GPS connection was bad, and Raileanu was looking around for the road to go–either to the I-15 or the I-95.  She did not know which road.

She did not notice the bag in the passenger compartment of the car because she was tired, hungry, wanted something to eat, and was not looking in the car at all.  She was looking at the GPS when they left the gas station and did not see Raileanu take the cards from the bag in the back seat and put them in the center console.  She was trying to figure out where they were going.  Raileanu was moving a lot, but she did not see him take a handful of credit cards and put them in the center console right next to where she was sitting.  She was not aware that the cards were in the console until the officers came out with them after searching.  She testified that if Raileanu pulled a handful of cards she would have seen it, but "maybe he did that, like, little by little."

When they were pulled over, the officer said they were stopped because they went on the fog line.  The officer asked Raileanu if he had been drinking.  Raileanu answered he had not.  When the officer asked Raileanu about why he had been acting suspicious at the gas station, Raileanu was nervous and did not know what to answer.  The officer asked why he was nervous and asked more questions.  Dopca denied that Raileanu answered the officer that he was asking suspicious at the gas

24

1   station because he did not have a driver's license.  After Raileanu gave the officer ID, he said he did not

2   have a driver's license.  Raileanu did not tell the officer they were going to Brianhead because they

3   could not remember the name, and the GPS did not show an address.  She heard Adams testify that

4   there was no evidence of an attempt to program Brianhead into the GPS.  It was not programmed

5   because there is no address to Brianhead.

6   Dopca tried to translate while the officers asked questions inside the car.  Raileanu consented to

7   a search of the car when he was outside the car out of her hearing.  She could hear "talking, talking,

8   talking," which meant that Raileanu was not understanding what they wanted.  She yelled from the car

9   that she could help, but nobody heard her.  The officers were not very rude to her but were rude when

10   she was told to shut up.  It was very cold, and Raileanu tried to hug her because she was shaking very

11   bad.  They were speaking in Russian or Moldovan.  The officers told her to move away from Raileanu.

12   The officer did not give her *Miranda* rights.  Instead, he just said, "'*Miranda* rights' and that's

13   it."  He did not tell her what those rights were.  He did not ask her if she understood and was willing to

14   talk.  The officers just started asking questions.

15   She and Raileanu belong to a gym at 215 and Flamingo.  She does not know a Bill.  She only

16   trains in the women's fitness room.  Raileanu never talked to her about who his friends were that he

17   worked out with.  She does not speak with anyone at the gym and stays in the women's room.

18   At the justice facility, she was given food, milk and water, and was allowed to use the restroom.

19   She was not handcuffed.  There were no bars or doors where she was sitting.  In the first few minutes,

20   the officers saw her sit near Raileanu and hug him.  They took her away to the lobby and did not allow

21   the two to have further contact.  She hugged him for the last time before they took him to a different

22   room.

23   She saw Agent Adams examine the cards in the lobby.  She only saw him slide one card.

24   Adams was explaining to the other officers and then went into the room where Raileanu was.  Dopca

25   could not see the door to the room from where she was sitting and did not know what happened inside

26   the room.  She asked to go to the restroom to see him and saw the door was closed.  She saw the door

27   open and close when they brought Raileanu food.  Another officer was not in the room with Raileanu

28   / / /

1   the whole time.  Two officers were sitting and talking with her, "and another one was just sitting there

2   and that's it."

3       At some point Agent Adams spoke with her.  He gave her *Miranda* rights in a way she could

4   understand, and she answered his questions.  Agent Adams did not ask her about why there was a bag

5   full of cards in the car.  Adams was polite and did not exert any pressure.  Adams advised her she was

6   not in the United States legally.  She understood Adams could have taken her to jail, but explained that

7   because she was pregnant, he would let her be responsible and come into the office later.  She did so.

8       At his office Adams asked her for her information to put into the computer.  He asked for her

9   ID.  She said her Moldovan driver's license was in the car and she'd go get it.  Adams asked her if she

10  had the GPS.  She said yes, and Adams told her he needed it.  He and another agent went downstairs

11  with her.  Adams became mean and told her he would force her to sign the consent form when she said

12  she could not do it.  She had already given the agents the GPS at this point.  She asked for the GPS back

13  and they gave it to her.  Adams brought her the form with her name on it and she filled out the rest of

14  the form.  She was afraid not to sign because she was pregnant and alone in this country.  Adams was

15  nice, but she was feeling pressure and could not stop crying.  She was not afraid of the agent asking her

16  questions, but of being alone because "he remembered me all this."  A few questions later, she seemed

17  to suggest that it was the other agent talking with her that caused her to remember that she was alone in

18  this country.

19      In response to questions by the court, Ms. Dopca testified she did not understand she needed to

20  remain outside the courtroom on the second day of the evidentiary hearing.  She did not hear the court

21  tell all of the witnesses who were going to testify in this case they had to stay outside in the hall and not

22  talk about their testimony on the first day of the hearing.  Mr. Palazzo told her to wait outside.  She

23  spoke with Mr. Palazzo briefly after court the first day.  He did not explain to her that she was required

24  to remain outside the courtroom except when she was going to testify.  She did not understand that she

25  was not supposed to be in courtroom because in immigration court they allowed her to stay.

26      She was also adamant in response to questions by the court about her testimony that Agent

27  Adams said he would "force" her to sign the consent form.  She was sure those were the exact words he

28  used. She was in a little room and felt that everybody could do whatever they want.  The officers in

26

Mesquite also said they would "force you" while she was pulled over on the highway, and again while she was at the justice facility.

### III.    Applicable Law & Analysis.

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people, not places." *Id*. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963)**.**

### A.    Reasonable Suspicion for a Traffic Stop.

An officer making an investigatory stop of a vehicle "must have at least a reasonable suspicion of criminal misconduct before detaining a driver." *United States v. Rojas-Millan*, 234 F.3d 464, 468 (9th Cir. 2000) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). The Fourth Amendment's prohibition against unreasonable searches and seizures extends to brief investigatory stops of persons or vehicles that fall short of an arrest. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An investigatory detention requires reasonable suspicion that criminal activity may be afoot. *Id*. Reasonable suspicion is a "narrowly drawn exception to the probable cause requirement of the Fourth Amendment." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). The police may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down search for weapons. *Id*. at 22-24. An investigatory detention balances law enforcement's need to search and seize against the personal invasion which the search or seizure entails. *Id*. at 21 (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 534 (1967)). Under this balancing approach, important governmental interests justify a brief and investigatory detention on less than probable cause. *Terry*, 392 U.S. at 21.

Law enforcement officers may initiate an investigatory detention only if they have reasonable, articulable suspicion of criminal activity. *Id*. at 21-22. The government must point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggests criminal activity has occurred or is imminent. *Id*. A law enforcement officer who makes observations which reasonably lead him to suspect that a particular person has committed, is committing, or is about

1  to commit a crime, may detain that person briefly in order to investigate the officer's suspicions.

2  *Berkemer v. McCarty,* 468 U.S. 420, 439 (1994).

3      Courts look at the "totality of the circumstances" on a case-by-case basis to determine whether

4  reasonable suspicion existed.  *United States v. Cortez,* 449 U.S. 411, 417 (1981).  Inarticulable hunches

5  or generalized suspicions are insufficient.  *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979).  Courts must

6  look at the totality of the circumstances in each case to determine whether a detaining officer has a

7  "particularized and objective basis" for suspecting legal wrongdoing.  *Arvizu*, 534 U.S. at 272.

8  Investigating officers are entitled to draw on their training and experience "to make inferences from and

9  deductions about the cumulative information available to them that 'might well elude an untrained

10  person.'"  *Id*. at 272.  The Supreme Court has recognized that "the concept of reasonable suspicion is

11  somewhat abstract."  *Id*.  The Fourth Amendment is satisfied if the officer's action is supported by

12  reasonable suspicion to believe that criminal activity may be afoot, and observations and factors that are

13  by themselves consistent with innocence may collectively amount to reasonable suspicion.  *Id*. at 273

14  (internal quotation and citations omitted).

15      The court finds that under the totality of the circumstances, Bundy had reasonable suspicion to

16  conduct a traffic stop.  Officer Bundy testified he decided to conduct a traffic stop of Raileanu's vehicle

17  before observing the vehicle cross over the fog line after it entered onto I-15.  He testified he intended

18  to stop the vehicle because he believed criminal activity may be afoot.  He concluded the driver of the

19  vehicle may be engaged in criminal activity because the driver quickly turned into the gas

20  station/convenience store parking lot right after Officer Bundy did a u-turn and pulled his patrol car

21  behind the black Mercedes.  Based on his training and experience, this is suspicious of criminal activity

22  because it indicates individuals who are trying to break off police contact.  Officer Bundy testified that

23  this is conduct that the individuals who have outstanding warrants or drugs or other types of contraband

24  engage in to avoid the police.  Officer Bundy observed Raileanu look in his direction as Officer Bundy

25  passed the parking lot in his patrol car and decided to circle around.  As he passed the parking lot a

26  second time, Officer Bundy observed Raileanu peering around the corner of the building twenty to

27  twenty-five feet from the entrance  to the convenience store, appearing to be looking for his patrol car.

28  As a result of these observations, Bundy pulled his patrol car into the RV lot to observe the black

Mercedes as it left the parking lot.  By then, he had decided to pull the vehicle over.  However, he followed the vehicle a short time to observe the driver's traffic patterns.  Raileanu did not engage in any erratic driving and negotiated a roundabout to get on the I-15 northbound.  However, Bundy testified that after getting on the I-15, Raileanu's vehicle crossed the white fog line three times within a quarter of a mile.[1]  In Bundy's training and experience, crossing the fog line three times in such a short distance can indicate a DUI driver, or someone who is looking in the rear-view mirror for a police officer who is not paying full attention to his driving.

Defense counsel skillfully cross-examined Bundy to establish that there may have been innocuous, innocent reasons for the conduct Bundy found suspicious of possible criminal activity.  For example, counsel suggested that there may have been phones along the wall of the building where he observed Raileanu peering, and that I-15 was visible from that location to a person looking where to get on the freeway.  Counsel for Raileanu also made a point of emphasizing that Bundy decided to stop the vehicle before observing the car cross the fog line suggesting, without stating, that the traffic infraction was a pretext for a stop lacking reasonable suspicion.

The touchstone of the Fourth Amendment is reasonableness.  *Florida v. Jimenez,* 500 U.S. 248, 250 (1991).  As long as there is an objectively reasonable basis to perform a traffic stop, the stop will be permitted by the Fourth Amendment.  *Whren v. United States,* 517 U.S. 806, 813 (1996).  Subjective intentions play no role in ordinary Fourth Amendment analysis.  *Id.*  The Supreme Court has been "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."  *Id.*  In *Whren,* a unanimous Supreme Court held that a traffic stop was reasonable under the Fourth Amendment where officers had probable cause to believe a traffic violation occurred, even if the ultimate charge was not related to the traffic stop.  *Id.* at 808-09.[2]  Or, as the Ninth Circuit has

---

[1]Bundy's police report and testimony on direct examination was that the vehicle crossed the white fog line three times within a quarter of a mile.  On cross-examination he answered yes to defense counsel's leading question that he observed the vehicle "touch" the fog line three time in a quarter mile.

[2]Although *Whren* involved a probable cause traffic stop, only reasonable suspicion is required to conduct a traffic stop.  "An officer making an investigatory stop of a vehicle must have at least reasonable suspicion of criminal misconduct before detaining a driver."  *United States v. Rojas-Millan*, 234 F.3d 464, 468 (9th Cir. 2000).

articulated its understanding of *Whren's* holding, if officers have reasonable suspicion to conduct a traffic stop, it does not offend the Fourth Amendment even if the stop served some other purpose. *United States v. Willis,* 431 F.3d 709, 715 (9th Cir. 2005). Courts examining reasonable suspicion for an investigatory detention "cannot second-guess the reasons for the officer's stop." *Id*. at 716. Parsing a police officer's subjective motivations is "precisely what *Whren* tells us we may not do." *Id*. at n.6. Thus, the fact that a police officer does not intend to issue a ticket to a driver for a traffic infraction does not constitute a violation of the Fourth Amendment as long as the officer had reasonable suspicion to conduct the stop for the traffic infraction. *Id*. at 717 ("*Whren* and *Lopez-Soto* require that officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers issue citations.")

In this case, the court finds Bundy had reasonable suspicion to conduct a traffic stop under the totality of the circumstances. "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong,* 224 F.3d 1136, 1140 (9th Cir. 2000). A stop may be founded on reasonable suspicion despite a possible innocent explanation for every police observation. *Id.* Additionally, courts examining whether reasonable suspicion supports a stop should not view each factor in isolation or give no weight to factors for which an innocent explanation may exist. *Arvizu,* 534 U.S. at 275-76. Although the conduct Bundy observed in pulling into the parking lot, looking in his direction as he passed by, and peering around the building appearing to be looking for his patrol car may have been innocuous to an untrained observer, officers are entitled to draw on their training and experience to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. Bundy articulated a particularized and objective basis for suspecting Raileanu of legal wrongdoing before observing the vehicle cross over the fog line three times in a quarter mile after getting on I-15.

Reasonable suspicion is an abstract concept. *Arvizu*, 534 U.S. at 272. The court finds that Officer Bundy's observations of conduct that was conceivably consistent with innocence collectively amounted to reasonable suspicion. The observations of the vehicle crossing over the fog line three times before the stop was conducted only added to Bundy's reasonable suspicion. The court found Officer Bundy's testimony credible that a driver crossing over a fog line three times in such a short

/ / /

1  distance is, based on his training and experience, either indicative of potential impairment or a driver's

2  inattention caused by looking in the rear view mirror to detect the officer's presence.

3      Raileanu's motion cites the Ninth Circuit's decision in *United States v. Conlin* to support his

4  arguments that the traffic stop was not based on reasonable suspicion.  The motion suggests that Bundy

5  pulled Raileanu's vehicle over solely for a traffic infraction for crossing over the fog line.  In *Conlin*,

6  the Ninth Circuit held that a traffic stop was not based on reasonable suspicion of a violation of a

7  statute similar to NRS 484B.223.  The officer only observed the driver touching the white fog line and

8  center yellow line each for ten seconds after legitimate lane changes, and only observed the vehicle for

9  a total of thirty-five to forty-five seconds.  The officer suspected that the driver of the vehicle might be

10  impaired.  He pulled the vehicle over for failing to maintain the travel lane.  The Ninth Circuit found it

11  significant that after the vehicle was pulled over, the officer did not ask the driver whether he had been

12  drinking, or ask the driver to submit to field sobriety tests.  The Ninth Circuit predicted that the

13  California Supreme Court would decide that the conduct observed was insufficient to constitute a

14  violation of its lane-straddling statute.

15      Here, Bundy's police report and testimony establish that his observation of the vehicle crossing

16  the fog line three times in a quarter mile was only one factor in his reasonable suspicion determination.

17  It is uncontroverted that Bundy asked Raileanu whether he had been drinking shortly after pulling him

18  over.  Raileanu denied that he had been drinking.  Bundy testified he did not observe any other

19  indicators of impairment and quickly ruled out his suspicion that Raileanu was impaired.  The court has

20  found that, given the totality of the circumstances, Bundy's traffic stop of Raileanu was supported by

21  reasonable suspicion.  The court, therefore, need not decide whether the Nevada Supreme Court would

22  hold that crossing over the fog line is a violation of NRS 484B.223.

23      **B.    Scope and Duration of the Stop**.

24      Relying on *United States v. Chavez-Valenzuela*, 268 F.3d 719 (9th Cir. 2001), Raileanu's

25  motion argues that Raileanu's Fourth Amendment rights were violated because Bundy did not limit the

26  scope of the stop to the justification for his initial contact.  Specifically, Raileanu argues that after

27  determining he was not impaired, Bundy should have either issued a citation or given Raileanu a

28  warning and allowed him to leave instead of questioning him further.

31

In *Chavez-Valenzuela*, the Ninth Circuit held that a police officer conducting a traffic stop may only ask questions that are reasonably related in scope to the justification for the initial contact, and that reasonable suspicion is required to expand the scope of questioning. *Id*. at 724. However, the Supreme Court overruled this holding in *Muehler v. Mena*, 544 U.S. 93 (2005). In *Muehler*, the Supreme Court held that the defendant's Fourth Amendment rights were not violated because she was questioned about her immigration status following her detention during the execution of a search warrant. Citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991), the Supreme Court held that the officer did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status. 544 U.S. at 101. The Supreme Court stated that it had repeatedly held that mere police questioning does not constitute a seizure, and that even when officers had no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search. *Id*. (internal quotations and citations omitted). The Ninth Circuit has recognized that *Muehler* overruled *Chavez-Valenzuela*'s holding that police are required to have reasonable suspicion to ask questions beyond the scope of a traffic stop. *See United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007); *United States v. Turvin*, 517 F.3d 1097, 1100 (9th Cir. 2008); *United States v. Mendez*, 476 F.3d 1077, 1079-80 (9th Cir. 2007).

In this case, Bundy asked a reasonable number of questions designed to dispel or confirm his suspicions about Raileanu's conduct in breaking off contact with his patrol car, observations of Raileanu in the parking lot, and driving over the fog line. He quickly concluded that Raileanu was not impaired. He asked for Raileanu's driver's license, registration, and insurance. Raileanu did not have a driver's license, but presented an ID card. Bundy then requested that Raileanu step out of the vehicle to talk with him further, and Raileanu did so. The investigative detention must be tailored to its underlying justification and may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 560 U.S. 491, 500 (1983). However, it is objectively reasonable under the Fourth Amendment to check a motorist's driver's license and registration. *Id*. General questioning during a traffic stop concerning the starting point, destination and general travel plans are also objectively reasonable. *See Chavez-Valenzuela,* 268 F.3d at 724. Similarly, a dog sniff performed during an

/ / /

32

otherwise lawful traffic stop does not violate the Fourth Amendment as long as it does not unreasonably prolong the stop.  *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).

Here, Bundy asked Raileanu a reasonable number of questions about his suspicious conduct, where he was heading, and the purpose of his travel.  Raileanu's answers heightened Officer Bundy's suspicion that criminal activity was afoot.  Raileanu told Bundy that he pulled into the gas station parking lot because he did not have a driver's license.  Raileanu also told Bundy that he and his girlfriend were going skiing in Utah, but he did not know where.  Raileanu claimed that he was going to call a friend when they got to Utah and get directions.  Bundy did not notice any luggage or ski accouterments in the vehicle or on the roof.  Bundy concluded that contraband might be in the car and asked Raileanu for consent to search.  Bundy testified that he believed he asked for the consent to search three or four minutes after the initial stop.  After obtaining Raileanu's oral consent, he called for backup.  The court found Officer Bundy credible in this regard.  Bundy received consent three or four minutes after the initial stop and called for backup.  Bundy's recollection is corroborated by Officer Averett's testimony and the radio logs for each officer which established the stop was conducted at 10:21 p.m., and that Averett arrived on the scene eight minutes later at 10:29 p.m.  In short, the court finds that Bundy's initial questioning and request for consent did not unreasonably prolong the duration of the initial traffic stop.

### C.   Raileanu's Consent to Search the Vehicle.

A warrantless search is unconstitutional unless the government demonstrates that it falls within certain well-established exceptions to the warrant clause.  *See United States v. Brown,* 563 F.3d 410, 414 (9th Cir. 2009) (citing *United States v. Murphy,* 516 F.3d 1117, 1120 (9th Cir. 2008) (internal citation omitted)).  Consent is one such exception, and the Supreme Court has held that a warrantless search conducted pursuant to a valid consent is "constitutionally permissible."  *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973).  It is the government's burden to demonstrate that consent was voluntary.  *See United States v. Soriano,* 361 F.3d 494, 501 (9th Cir. 2004).  Whether consent to search was voluntary and intelligent is a question of fact, and its resolution depends upon the totality of the circumstances.  *See United States v. Brown,* 563 U.S. 410, 415 (9th Cir. 2009) (citing *Schneckloth,* 412 U.S. at 227).

The Ninth Circuit considers the following factors in determining whether a person has voluntarily consented to a search: (1) whether the person consenting was in custody; (2) whether the officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the person consenting was told she had the right not to consent; and (5) whether the person consenting was told that a search warrant could be obtained. *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (citing *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)).   When reviewing the surrounding circumstances, however, there is no "mechanized formula to resolve the voluntariness inquiry," and no one factor is dispositive. *Soriano,* 361 F.3d at 502.

Raileanu argues his consent to search was invalid because English is not his primary language, and under the totality of the circumstances, it was not voluntary.  His motion suggested that there may have been some coercive police conduct.  The Ninth Circuit has considered whether a suspect fully understood an officer's questions as a relevant factor in the considering the validity of a suspect's consent. *See United States v. Castrillon*, 716 F.2d 1279, 1282-84 (9th Cir. 1983).

Bundy, Averett, and Adams all testified consistently and credibly that they spoke with Raileanu in English and that Raileanu responded appropriately in English.  Raileanu did not ask for an interpreter or claim at any point during his encounter with any of the three officers that he did not understand English.  Adams testified that Raileanu had an accent and mispronounced some words, but they had no difficulty communicating.  Raileanu's grasp of the English language was sufficient enough that he understood Adams was insinuating without directly stating that Raileanu was able to afford nice clothing and an expensive car because of Raileanu's criminal activity.  Raileanu reacted angrily to this insinuation and responded that Adams did not know anything about him.  Raileanu went on to explain that he made a lucrative living buying vehicles at auction, repairing them and selling them.  The only evidence that Raileanu is not proficient in English came from the testimony of Ms. Dopca.  Ms. Dopca testified, in essence, that because she knows Raileanu, she knew that his "talking, talking, talking" meant that he did not understand.  However, Raileanu responded appropriately to questions in English, followed instructions in English, and provided identification and registration when requested in English.  The court found the three officers substantially more credible than Ms. Dopca regarding Raileanu's proficiency in the English language.

Applying the Ninth Circuit's consent factors, the court finds that although Raileanu was not under arrest at the time he was asked to consent, he was not free to ignore the police presence and go about his business. Bundy had Raileanu's identification and registration in the patrol car. Bundy acknowledged that he had no reason to hold Raileanu if he decided to leave. However, Bundy did not advise Raileanu he was free to leave before asking for consent to search or return Raileanu's documents. Bundy did not have his weapon drawn at any time during the encounter. *Miranda* warnings were not given until after consent was obtained and Bundy found the credit cards. However, as Raileanu was not in custody, *Miranda* warnings were not required. Bundy did not advise Raileanu that he had the right to refuse to consent to search, and did not present Raileanu with a written consent to search form that contained this advice. Raileanu was not told that a search warrant could be obtained if he declined to consent. The first and fourth factors weigh in favor of Raileanu. The remaining factors do not. The court finds Raileanu's verbal consent to search the car was voluntary and intelligent under the totality of the circumstances. It was obtained three to four minutes after the initial stop. It was obtained after Bundy explained why Raileanu had been stopped, and briefly questioned Raileanu about whether he had been drinking, and why he had been acting suspiciously in the parking lot prior to the stop. Bundy did not accuse Raileanu of engaging in any criminal activity or threaten Raileanu with an arrest even though he was aware Raileanu was driving without a valid driver's licence. Finally, at the time the consent was given Bundy was the only officer at the scene. Under all of these circumstances, the court concludes Raileanu's consent was voluntarily and intelligently given.

### D.   Miranda Warnings, Custodial Interrogation, and Voluntariness – Defendant's Statements

The Government has the burden of proving, by a preponderance of the evidence, whether a confession is voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The Government must also establish, by a preponderance of the evidence, that a defendant waived his protection against self incrimination under *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

#### 1.   The Requirement for *Miranda* Warnings

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Custodial interrogation is questioning initiated by law

1   enforcement officers after a person has been taken into custody or deprived of his freedom.  *United*

2   *States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001) (citing *Miranda v. Arizona*, 384 U.S. 436, 444

3   (1966)).  In determining whether a suspect was in custody for the purposes of determining whether

4   *Miranda* warnings were required, the court determines whether there was a formal arrest or restraint on

5   freedom of movement to the degree associated with formal arrest.  *Stansbury v. California*, 511 U.S.

6   318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

7                   **2.    Custodial Interrogation**

8           The determination of whether a defendant is in custody for purposes of the requirement to

9   provide *Miranda* warnings is determined by examining the objective circumstances of the interrogation.

10   *Stansbury*, 511 U.S. at 323.  Because the courts are directed to examine the objective circumstances of

11   the interrogation, the subjective views of either the suspect or the interrogating officer are not relevant

12   to the determination of whether the defendant was in custody.  *Id.*; *see also United States v. Leasure*,

13   122 F.3d 837, 840 (9th Cir. 1997).  In *United States v. Butler*, the Ninth Circuit identified some of the

14   objective circumstances the court should examine in determining whether the defendant was in custody

15   so as to trigger the requirement for providing *Miranda* warnings.  These include language used by the

16   officers, the physical characteristics of the place where the questioning occurs, the degree of pressure

17   applied to detain the individual, the duration of the detention, and the extent to which the person was

18   confronted with evidence of guilt.  249 F.3d 1094, 1099 (9th Cir. 2001).

19           In the Ninth Circuit, the issue of whether a defendant was subject to interrogation is a mixed

20   question of law and fact which is reviewed by the Court of Appeals de novo.  *United States v.*

21   *Morino-Flores*, 33 F.3d 1164, 1168 (9th Cir. 1994); *United States v. Foster*, 227, F.3d 1096, 1102 (9th

22   Cir. 2000).

23           The Supreme Court and Courts of Appeals have repeatedly emphasized that many types of

24   questions are not considered interrogation and do not require *Miranda* warnings.  For example,

25   questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings.

26   *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S.

27   873, 881 (1975)).  In *Berkemer*, the officer asked the suspect to perform a field sobriety test, and asked

28   if that he had been using intoxicants.  The Supreme Court found *Miranda* warnings were not required,

1  finding an officer is permitted to ask a suspect in a traffic stop, "a moderate number of questions to

2  determine his identity, and to obtain information confirming or dispelling the officer's suspicions." *Id*.

3  Questions of this nature "cannot fairly be characterized as the functional equivalent of formal arrest."

4     Similarly, "routine booking" questions reasonably related to police record keeping concerns do

5  not require *Miranda* warnings because they are not designed to elicit incriminating responses.

6  *Pennsylvania. v. Muniz*, 496 U.S. 582, 600-02 (1990) (plurality opinion).  Asking a suspect questions

7  regarding general biographical information is not interrogation.  *United States v. Foster*, 227 F.3d 1096,

8  1103 (9th Cir. 2000).  General on-the-scene questioning does not constitute interrogation for purpose of

9  the Fifth Amendment and thus does not require *Miranda* warnings.  *See, e.g., United States v. LaGrone*,

10  43 F.3d 332, 335 (7th Cir. 1994) (finding no interrogation when police ask suspected drug dealer for

11  permission to search store); *United States v. Klein*, 13 F.3d 1182, 1184 (8th Cir. 1994) (finding no

12  interrogation when officer stopped defendant in hospital parking lot to ask about shooting victim

13  defendant brought to hospital); *Vickers v. Stewart*, 144 F.3d 613, 616-17 (9th Cir. 1998) (finding no

14  interrogation when prison guard pulled defendant from emergency scene of fire and asked what

15  happened); *Garcia v. Singletary*, 13 F.3d 1487, 1491-92 (11th Cir. 1994) (finding no interrogation

16  when prison officer asked prisoner why defendant started fire to determine fire's cause).

17        **3.    Voluntariness**

18     For a statement to be voluntary, it must be "one that is the product of a rational intellect and free

19  will." *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (citing *Blackburn v. Alabama*, 361

20  U.S. 199, 208 (1960)).  In examining the voluntariness of a confession, the court must consider

21  "whether, under the totality of the circumstances, the challenged confession was obtained in a manner

22  compatible with the requirements of the Constitution." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th

23  Cir. 1991).  In addition, the Supreme Court has determined that coercive police activity is a necessary

24  predicate to a finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167

25  (1986).  It is the government's burden to prove that a confession was voluntary by a preponderance of

26  the evidence. *United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404

27  U.S. 477, 489 (1972)); *see also Connelly,* 479 U.S. at 168.

28  / / /

1    The court must examine the totality of the circumstances and "determine whether 'the

2    government obtained the statement by physical or psychological coercion or by improper inducement so

3    that the suspect's will was overborne.'" *United States v. Harrison*, 34 F.3d 886, 890 (9th 1994)

4    (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).  The court should

5    consider the characteristics of the accused and the details of the interrogation.  *Kelley*, 953 F.2d at 565

6    (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  In *Kelley*, the court found that even

7    though the defendant was going through heroin withdrawal, began experiencing chills, shaking and

8    trembling, and told Agents they needed to hurry if they wanted to continue the interrogation, Kelley was

9    still able to think rationally.  The personal characteristics of the accused are "constitutionally irrelevant

10   absent proof of [police] coercion."  *Derrick*, 924 F.2d at 818 (quoting *United States v. Rohrbach*, 813

11   F.2d 142, 144 (8th Cir. 1987) (citations omitted)).

12       In this case Bundy's initial questions of Raileanu immediately following the traffic stop did not

13   require *Miranda* warnings.  Raileanu was detained and not free to leave.  However, the stop was

14   conducted in public along the roadside of I-15, and there is no evidence to support a finding that Bundy

15   engaged in coercive conduct.  Bundy advised Raileanu of the purpose for the stop and asked whether he

16   had been drinking.  Bundy quickly concluded Raileanu was not impaired, and asked for his

17   identification, driver's license and insurance.  Bundy's general on-the-scene questions to confirm or

18   dispel his suspicions were not the functional equivalent of a formal arrest.

19       Bundy obtained Raileanu's consent to search the car three to four minutes after the initial stop.

20   He called for backup and Officer Averett arrived eight minutes later.  Averett asked Dopca to get out of

21   the car while Bundy searched.  Averett positioned himself so that he could observe Raileanu and Dopca

22   outside the vehicle and cover Bundy while he searched the car.  Raileanu and Dopca could see what

23   both officers were doing.  At no point did either Raileanu or Dopca ask that Bundy stop searching, or

24   withdraw consent to the search.

25       Bundy recovered more than 100 credit cards from two different locations in the vehicle and

26   concluded they were fraudulent for reasons he described in his testimony.  Specifically, the number of

27   cards, the fact that they all had the same expiration date, no names on the front, and two sets of

28   numbers, one of which were crossed out, made him conclude the cards were fraudulent or counterfeit.

1    As a result, he administered *Miranda* warnings to Raileanu before questioning him further about the

2    cards.  The court finds that all of Raileanu's statements up to this point are admissible as *Miranda*

3    warnings were not required.  However, after Bundy found the cards and decided to question Raileanu

4    about them, Bundy administered *Miranda* warnings.  It is undisputed that Bundy's administration of

5    *Miranda* warnings omitted advising Raileanu that if he could not afford to hire an attorney one would

6    be appointed for him.  Raileanu's supplemental points and authorities after evidentiary hearing concede

7    that Bundy's erroneous omission of this right was inadvertent rather than intentional.  However,

8    Bundy's failure to properly advise Raileanu of all his *Miranda* rights renders Raileanu's subsequent

9    statements at the scene of the traffic stop inadmissible.

10        After the hearing, both sides submitted supplemental points and authorities addressing Bundy's

11   failure to administer proper *Miranda* warnings.  The government argues that up until the time the

12   *Miranda* warnings were administered and *Miranda* warnings were not required because Raileanu was

13   not in custody.  Therefore, any statements made before *Miranda* warnings were administered were

14   admissible.  The government does not suggest that any of Raileanu's statements to Bundy following the

15   ineffective *Miranda* warnings are admissible.  However, the government maintains that Raileanu's

16   subsequent statements to Adams after being advised of *Miranda* rights are admissible.  Raileanu's post-

17   hearing points and authorities argue that Adams' second proper *Miranda* warning did not cure Bundy's

18   earlier inconsistent *Miranda* warnings and therefore, his statements to Adams should be suppressed.

19   He relies on the Ninth Circuit's decision in *United States v. San Juan-Cruz*, 314 F.3d, 384 (9th Cir.

20   2002) to support his arguments that a subsequent proper *Miranda* warning does not cure a prior

21   inconsistent and confusing *Miranda* warning.  He contends that Adams' second proper *Miranda*

22   warnings did not cure Bundy's first deficient *Miranda* warnings because it did not specifically address

23   and clarify the proper scope of Raileanu's right to an appointed attorney.

24        Whether *Miranda* warnings alone are sufficient to dissipate the taint of an initial *Miranda*

25   violation and render a subsequent statement admissible depends upon: (a) whether the subsequent

26   *Miranda* warnings were effective; and (b) whether the first confession was given voluntarily.  *See*

27   *Missouri v. Seibert,* 542 U.S. 600, 611-15; *Oregon v. Elstad*, 470 U.S. 298,  318.

28   / / /

1    In *Siebert*, police questioned the defendant without *Miranda* warnings to solicit a confession.

2  *See* 542 U.S. at 616.  Fifteen to twenty minutes after defendant made an unmirandized confession,

3  police read her *Miranda* warnings, reminded her of her prior inculpatory statement, and elicited the

4  same statement.  *Id.* at 612-13.  The Supreme Court found both sets of statements inadmissible, holding

5  that in order for a "mid-stream" *Miranda* warning to have effect, the suspect must understand that she

6  can choose whether or not to give a statement regardless of her prior statements.  *Id.* at 616-17; *United*

7  *States v. Mejia*, 559 F.3d 1113, 1117 (9th Cir. 2009) (second confession admissible when officer did his

8  best to quiet the defendant in the midst of defendant's confession to give *Miranda* warnings).

9    In *Siebert*, the Supreme Court held that a defendant's post-*Miranda* statements may be

10  inadmissible if law enforcement officers use a two-step interrogation process to elicit an un-warned

11  confession, and then administer *Miranda* warnings and obtain a repeat confession.  *Siebert*, at 609-10.

12  *Siebert* held that if police officers deliberately employ this two-step strategy, post-warning statements

13  must be suppressed unless curative measures are taken to apprise the defendant of his rights.  *Id.*, at

14  622.  However, if the two-step method is not deliberate, the post-warning statements are admissible if

15  voluntarily made.  *Id (Kennedy, J.* concurring)[3].

16    Raileanu's reliance on *San Juan-Cruz* is misplaced.  There, the defendant was arrested by

17  Border Patrol attempting to illegally re-enter the United States after being deported.  The defendant was

18  advised of administrative rights pursuant to 8 C.F.R. § 287.3 and told that he had the right to counsel

19  during questioning, but not at government expense.  Later, the defendant was informed that he could be

20  charged criminally and *Miranda* warnings were read to him which advised him he had the right to have

21  a lawyer appointed if he could not afford to hire one.  The Ninth Circuit found that the defendant's

22  statements were inadmissible because these two sets of conflicting warnings were confusing to the

23  defendant.

24  / / /

25

26  _____

27    [3]In *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th. Cir. 2007), the Ninth Circuit
   recognized that Justice Kennedy's concurrence in *Siebert* is the Supreme Court's holding because it is

28  the narrowest grounds with which the majority of the court would agree.

Here, Bundy advised Raileanu of his *Miranda* warnings, but omitted advising Raileanu that he had the right to court-appointed counsel if he could not afford to hire an attorney.  This renders all of Raileanu's statements to Bundy after defective *Miranda* warnings were administered inadmissible.  However, the court finds that Raileanu's subsequent statements to Special Agent Adams need not be suppressed because of Bundy's blunder.

It is uncontroverted that Adams administered complete *Miranda* warnings.  In fact, Adams exceeded the warnings *Miranda* required.  After providing a full set of *Miranda* warnings Adams told Raileanu that he did not have to say anything he did not want to, and that he could just sit there and listen to Adams' questions.  Additionally, this was clearly not a two-step interrogation process designed to elicit an un-warned confession and then obtain a repeat confession after obtaining a waiver of *Miranda* rights.  Bundy made a mistake which Adams' subsequent administration of *Miranda* warnings cured.

The court find's that Raileanu's statements to Adams were both knowing and voluntary.  Adams went beyond what *Miranda* requires in advising Raileanu that he did not have to say anything he did not want to say and could just listen to questions.  Adams did not engage in any coercive or threatening conduct.  Dopca's testimony that Raileanu was placed in a small room with the door closed at all times before Adams arrived was simply not credible.  First, she acknowledged she could not see the door to the room from where she was sitting in the lobby.  Second, both Bundy and Averett testified that the door was open at all times.  Averett was primarily keeping an eye on Dopca in the lobby.  Bundy primarily remained near the door to the open room while his sergeant remained in the room with Raileanu.  Adams testified that the door was open when he arrived.  Neither Raileanu nor Dopca were questioned while waiting for Adams to arrive.  The court found the officers' testimony credible that the conversation with Dopca and Raileanu while waiting for Adams was casual and friendly.  In short, the court finds that Raileanu's will was not overborne by any coercive police conduct, and Raileanu's post-*Mirada* statements to Adams are admissible.

### E.    18 U.S.C. § 3501(c).

Finally Raileanu argues that 18 U.S.C. § 3501(c) requires suppression of his statements to Special Agent Adams because they were obtained more than six hours after Raileanu's arrest, and this

delay was not reasonable.  18 U.S.C. § 3501(c) provides, in relevant part that in any criminal prosecution by the United States, a confession made by a defendant, while he or she was under arrest or otherwise detained by law enforcement, is not inadmissible solely because of delay in bringing the defendant before a magistrate judge if the confession is made voluntarily and given within six hours of the defendant's arrest.  *Id.*  The section does not apply where a delay is reasonable "considering the means of transportation and the distance traveled to the nearest magistrate judge or other officer."  *Id.*  In this case it is undisputed that Raileanu was initially arrested by Officer Bundy on the state charge of possession of a credit card without owner's consent.  Bundy took Raileanu into state custody and booked him into the Mesquite jail.

Adams did not have state arrest authority or a federal warrant and did not take Raileanu into federal custody.  After he completed the paperwork to notify the Moldovan Embassy of Raileanu's arrest, he left Raileanu in state custody and returned to Las Vegas.  Raileanu was transported by Mesquite Police to the Clark County Detention Center in Las Vegas where he remained in state custody.  He was not arrested on this federal charge and did not come into federal custody until Adams and another federal agent picked him up from the Clark County Detention Center to deliver him to the U.S. Marshal's Service.  Raileanu made an initial appearance before the undersigned the same date the Complaint and arrest warrant were entered on the record.  Agent Adams' uncontroverted testimony was that he did not ask Raileanu any questions about his criminal charges or this case during the short transport from the Clark County Detention Center to the federal courthouse.

**IV.     Conclusion.**

The initial traffic stop was based on reasonable suspicion.  The scope and duration of the stop was also objectively reasonable under the totality of the circumstances.  Raileanu gave a valid, intelligent, and knowing consent to search his vehicle three to four minutes after the initial stop.  All of Raileanu's statements to Bundy until Bundy administered *Miranda* warnings are admissible.  Bundy gave defective *Miranda* warnings which render Raileanu's statements to Bundy after the warnings were administered inadmissible.  However, Special Agent Adams subsequently administered effective *Miranda* warnings which exceeded *Miranda* requirements.  Raileanu's statements to Adams were voluntary, knowing and intelligent and therefore, admissible.

It is **RECOMMENDED** that Raileanu's Motion to Suppress (Dkt. #18) should be **GRANTED** to the extent that post-*Miranda* statements to Bundy are inadmissible.  However, the Motion to Suppress should be **DENIED** in all other respects.

Dated this 4th day of September, 2013.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE